**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROBERT F. CAVOTO, | ) |
|       Plaintiff, Counter-Defendant, | ) |
| v. | )   No. 08 C 6957 |
| MARY LOU HAYES, | )   HONORABLE DAVID H. COAR |
|       Defendant, Counter-Plaintiff. | ) |

## MEMORANDUM OPINION AND ORDER

Mary Lou Hayes filed a Form 1099-C information return with her 2006 federal income taxes, in which she reported her cancellation of an unpaid debt allegedly owed to her by her former son-in-law Robert F. Cavoto. Cavoto filed suit, claiming that Hayes's filing was fraudulent under § 7434 of the Internal Revenue Code. *See* 26 U.S.C. § 7434. Hayes counterclaimed, seeking repayment of the alleged debt, with interest. On December 14, 2009, this court conducted a bench trial at which Cavoto and Hayes both testified (as did Susan Cavoto, the plaintiff's ex-wife and the defendant's daughter). After examining the record and determining the credibility of the witnesses, the court now sets forth its findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a). The court finds for the defendant and counter-plaintiff Mary Lou Hayes on all claims and counterclaims.

## FINDINGS OF FACT

1) The American Express Account

Robert Cavoto is Mary Lou Hayes's former son-in-law. Around 2000-2001, Cavoto and

his (now ex-) wife Susan began to experience serious financial difficulties.[1] To help them through their hard times, Hayes first allowed Susan to have her own charge card issued on Hayes's American Express account; she later allowed Robert to have one as well. At least at first, the Cavotos were to pay for their own charges. Every month, Hayes would mail or, more typically, fax a copy of her monthly Amex statement to the Cavotos, who would pay Amex directly for the charges they had incurred. Susan used the Amex line of credit to pay for the family's household expenses (the Cavotos had five children), including food, gas, and sometimes clothing; and for some personal expenses. Robert used it primarily for business expenses but also for family and personal expenses. This arrangement appears to have worked smoothly until August 2002.

In August 2002, the Cavotos were unable to pay for the expenses they had incurred in June and July of that year. Without Susan's knowledge, Robert asked Hayes if she could cover those charges until he was able to repay her from income he expected his business to receive shortly. Hayes agreed to this arrangement, and from this point forward, she made several direct payments to Amex to cover charges incurred by the Cavotos. It was Robert, not Susan, with whom Hayes discussed the funds she was advancing on the Cavotos' behalf and arranged to be reimbursed. Hayes's payments continued until May 2003, around the time Robert and Susan separated (they later divorced in December 2004) and Robert's card was cancelled.

2) Reimbursement Agreement Between Hayes and Robert Cavoto

Hayes's payments to Amex on behalf of the Cavotos totaled $54,911.81. During 2002-03, Robert reimbursed Hayes $24,673.00, leaving a balance of $30,238.81 in unreimbursed

---

[1] References to 'Cavoto' are to Robert Cavoto. Where there is a possibility of confusing Robert and Susan Cavoto, the court will refer to them by their first names.

charges. Hayes repeatedly attempted to collect these funds from Robert throughout 2003-04, to no avail. From January 2005 through late 2006, Hayes appeared to have given up attempting to collect any reimbursement from Robert, and she never attempted to collect any funds from Susan. On December 6, 2006, Hayes mailed Robert a demand letter for payment of the $30,238.81 balance. The letter included an itemized accounting of the couple's charges paid by Hayes and Robert's reimbursements to Hayes. (*See* Hayes Ex. 7.) He returned the letter to Hayes after scrawling "To: Mary Lou Hayes Go F**k Yourself" across the front of the envelope. (*See* Hayes Ex. 11.)

At trial, Hayes testified that Robert repeatedly promised to repay her for the Cavotos' charges on her Amex account. She further testified that they never drew any distinction between Robert's charges and Susan's charges, or between business, family, or personal charges; there were simply charges that the Cavoto family incurred and that Robert promised to repay. Robert, however, testified that (1) there was no express agreement to repay any charges, including those he "felt obligated" to repay because they were his own; (2) he only agreed to pay his own charges, which included his business charges and personal expenses, and his "reasonable" share of family expenses; (3) he "probably" told Hayes that he refused to pay for "Susan's" charges; (4) Hayes "probably" said that she would gift the Cavotos in the amount of the unpaid charges.

While Hayes proved a credible witness with a consistent account of events, the court did not believe Cavoto's hedged and conflicting testimony. Moreover, his own e-mails to Hayes further undermine his already dubious claims. For instance, on April 30, 2003, he told Hayes by e-mail that he had deposited $8,000 in her account and that he planned to deposit another $10,000 by May 10 of that year. "Hopefully," he wrote, "by the end of May you will be paid off entirely." (Hayes Ex. 5.) At a minimum, then, he did not believe that Hayes had agreed to gift

him the remaining balance of his charges, at least not on or before the end of April 2003. So Hayes would have had to agree to gift him the balance once he and Susan had separated in April or May 2003—an unlikely story to say the least. On June 3, 2003, Cavoto informed Hayes by e-mail that he expected $23,000 in accounts payable to come in shortly and thanked her for her patience. (Hayes Ex.6.) But even the parties agree that Hayes never saw a penny of the $23,000 and that around this time, the only payment made by Cavoto to Hayes was $5,000 in May 2003. (Cavoto Ex.9; Hayes Exs. 7, 14.) Similarly, on April 24, 2003, Cavoto e-mailed Hayes to inform her that he expected $32,500 in accounts payable to come in shortly, and that "this money will be used to pay you back" and to hire a lawyer to press his claims for $40,000 in accounts payable still outstanding. (Hayes Ex. 4.)

In light of the in-court testimony, the evidence in the record, and especially the mismatch between the two in Cavoto's case, the court finds (1) that Hayes never told Robert that she would consider any unpaid Amex charges a gift; and (2) that Robert agreed to repay Hayes for the Cavotos' charges, without drawing any version of a distinction between "Robert's" and "Susan's" charges. Lastly, having reviewed the documents submitted into evidence—including the Amex statements and correspondence between the parties revealing payments made by Robert to Hayes—the court finds that the unpaid balance of the Cavotos' Amex charges paid by Hayes is in fact $30,238.51. (Cavoto Exs.7, 9, 12; Hayes Exs.1, 7, 14.)

3) Hayes's Form 1099-C Information Return

Hayes concluded in December 2006 that the remaining balance was an uncollectable debt. Her daughter Julie Cunningham is a certified public accountant who advised Hayes that in order to write off the remaining balance of the Cavotos' charges as a bad-debt deduction on her

federal income tax return, she would have to issue a Form 1099-C information return to Cavoto. This she did; the return is dated December 8, 2006. (Cavoto Ex.2.) On her 2006 federal return, Hayes took a non-business bad-deduction—as a $3,000 short-term capital loss—on her 1040 Schedule D. She reported the cancellation of a debt worth $30,238.51, making a thirty-cent error in her calculation.

On September 22, 2008, the IRS sent Cavoto written notice that he might he liable for $11,014.00 in additional taxes, interest, and penalties on his 2006 income tax. (Cavoto Ex. 4.) Cavoto filed a written objection with the IRS in October 2008, and on December 4, 2008, he filed a verified complaint in this court, alleging that Hayes's filing of a 1099-C was fraudulent under 26 U.S.C. § 7434, and seeking approximately $14,000 in attorney's fees allegedly incurred as a result of the filing. About one week later, on December 12, 2008, the IRS issued Cavoto a closing notice informing him that it would not pursue collection of any additional 2006 income tax from him. (Cavoto Ex.6.) To date, it has not done so. Based on Hayes's testimony, as well as the documentary evidence in the record, the court finds that Hayes filed a 1099-C in the honest belief that she was owed an uncollectable debt of $30,238.51.

4) The Present Litigation

The complaint sets forth several reasons why Hayes's filing of an information return was fraudulent under § 7434 of the Internal Revenue Code: (1) the remaining balance of Hayes's payments was a gift to the Cavotos; (2) Robert Cavoto acted as Hayes's "authorized agent" in incurring the Amex charges; (3) if the balance of the charges was not a gift, it was marital debt subject to a divorce property settlement in which Robert and Susan agreed to share existing marital liabilities equally; (4) if the business related charges Robert incurred on the Amex

account were neither a gift nor a marital debt, they are a liability of his company, 20/20, and not his personally; (5) Hayes is not an "applicable entity" within the meaning of § 6050P of the Internal Revenue Code, and is therefore prohibited from filing an information return; (6) the return was otherwise false and fraudulent. (Compl. ¶14(a)-(f).) The court rejected Cavoto's argument (5) on Hayes's motion for partial summary judgment. (*See* Dkt. No. 45.)

In her answer, Hayes asserted counterclaims for breach of the loan agreement between her and Cavoto, and for prejudgment statutory interest owed on account of vexatious delay of payment. *See* 815 ILCS 205/2.

## CONCLUSIONS OF LAW

1) Hayes's Allegedly Fraudulent 1099-C

Cavoto alleges that Hayes violated § 7434 of the Internal Revenue Code, which provides that "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a). The court disagrees.

As a general matter, tax fraud requires "intentional wrongdoing," *see Granado v. Comm'r of Internal Revenue*, 792 F.2d 91, 92-93 (7th Cir. 1986), and essential to that intent is "some element of concealment or deception." *Zell v. C.I.R.*, 763 F.2d 1139, 1144 (10th Cir. 1985). Evidence of tax fraud may therefore consist of "any conduct, the likely effect of which would be to mislead or to conceal." *Spies v. United States*, 317 U.S. 492, 499 (1943). As with any variety of civil fraud, each element of tax fraud must be shown by clear and convincing evidence. *Granado*, 792 F.2d at 94.

"To create an actionable claim under 26 U.S.C. § 7434, the information return must itself be fraudulent," which requires it to be, among other things, inaccurate. *Rossmann v. Lazarus*, 2008 WL 4181195, at *6 (E.D. Va. Sept. 3, 2008) (citing *Bailey v. Shell Western E & P, Inc.*, 1998 WL 185520, at *2-3 (N.D. Tex. Apr. 14, 1998)). Furthermore, "a claim under 26 U.S.C. § 7434 requires proof of deceitfulness or bad faith in connection with filing an information return." *Rossmann*, 2008 WL 4181195, at *6 (citing *Nash v. United States*, 2004 WL 3176885, at *6 (E.D. Mo. Oct. 12, 2004)). A mere "error or mistake" in filing an information return does not establish fraud under § 7434. *See Jacobs v. Ocwen Fed. Bank, FSB*, 311 F. Supp. 2d 766, 769 (N.D. Ind. 2004).

Cavoto offers a host of reasons why Hayes's 1099-C was allegedly fraudulent, but his arguments all fail at the threshold for the same simple reason: he has failed to show that Hayes filed an information return with fraudulent intent. *See Granado*, 792 F.2d at 92-93; *Zell*, 763 F.2d at 1144. As the court has found, he promised to reimburse Hayes for the balance of the Cavotos' outstanding Amex charges. Thus, she reported the cancellation of a bona fide debt, so unless she willfully misreported the amount of the debt, her return could not have been fraudulent. And at a bare minimum, Cavoto's repeated e-mail assurances that he was on the brink of repaying Hayes for the outstanding debts gave her ample basis for a good-faith belief that he had, in fact, promised to repay her. Thus, as the court has also found, Hayes had a good-faith belief, when she filed the 1099-C, that she was cancelling a bona fide yet uncollectable debt. That, too, is enough to preclude a finding of fraud. Furthermore, Hayes reported the amount of the cancelled debt truthfully. The worst that can be said of her 1099-C is that it was off by thirty cents: whereas the balance of the Cavotos' charges was (and remains) $30,238.81, the information return reports the cancellation of a debt worth $30,238.51. This discrepancy,

which Hayes herself points out in her post-trial brief, is clearly a *de minimis* arithmetical error and is not even in her favor. It is certainly not evidence of intent to mislead, deceive, or conceal.

In sum, there is absolutely no evidence, much less clear and convincing evidence, that Hayes engaged in any "intentional wrongdoing" in connection with the filing of her 1099-C information return. She merely reported the cancellation of a debt that she honestly—indeed, correctly—believed that she was owed. That is not tax fraud. Because Cavoto has failed at the threshold to carry his evidentiary burden under § 7434, the court need not explore his raft of arguments (most of which are, in any event, patently meritless on their own terms) in any greater detail. The court finds for Hayes on Cavoto's sole cause of action.


2) Hayes's Counterclaims: Breach of Contract and Prejudgment Interest

In Illinois, the elements of a breach of contract claim are (1) an offer and acceptance; (2) consideration; (3) definite and certain contractual terms; (4) the plaintiff's performance of all required contractual conditions; (5) the defendant's breach of the contractual terms; and (6) damage resulting from breach. *E.g.*, *Green v. Trinity Int'l Univ.*, 801 N.E.2d 1208, 1213 (Ill. App. Ct. 2003). These elements are all present here.

The testimony and documentary evidence establish that at Robert's request, Hayes agreed to cover the Cavotos' Amex charges and that Robert, in turn, promised to repay her when he had the money. That was an offer and acceptance, the terms of which were clear enough to enable the parties and the court to know what was agreed to. And although a precise timetable for repayment was never fixed, the court can imply a reasonable time for the performance of a contractual term, *see, e.g.*, *Rose v. Mavrakis*, 799 N.E.2d 469, 475 (Ill. App. Ct. 2003), including a time for payment to be made for consideration received. *See Meyer v. Marilyn Miglin*, 652

N.E.2d 1233, 1239 (Ill. App. Ct. 1995). Here—at a minimum—Hayes demanded performance from Robert in early December 2006, yet he has made no attempt to repay what he promised to repay. The court therefore concludes that he has failed to perform, or even start to perform, within a reasonable time. *See, e.g.*, *Murphy v. Roppolo-Prendergast Builders, Inc.*, 453 N.E.2d 846, 848 ("reasonable time for performance" is context-specific inquiry committed to trial court's sound discretion). Next, consideration to Robert came in the form of Hayes's payments to Amex on the Cavotos' behalf. Those payments also constitute Hayes's performance of her end of the bargain, and Robert's failure to reimburse her as promised constitutes his breach. Lastly, Hayes was damaged to the tune of $30,238.51, the balance of the un-reimbursed Amex charges. Hayes has therefore established the elements of a breach of contract claim.

In response, Cavoto argues that Hayes's counterclaim (1) relies on a misreading of the Illinois Rights of Married Persons Act; and is barred by (2) the statute of frauds, (3) the tax write-off Hayes took upon cancelling the debt, and (4) the statute of limitations. None of these arguments prevail.

*First*, Cavoto contends that the Illinois Rights of Married Persons Act, pursuant to which spouses are jointly and severally liable for "expenses of the family," 750 ILCS 65/15, does not apply in this case. The point of this argument seems to be that because he distinguished between his charges and Susan's charges, and only promised to reimburse Hayes for the former, he cannot be liable for Susan's charges unless joint and several liability under the Act applies. But he testified at trial that Susan routinely used her card for family expenses (*e.g.* Tr. 62:7-9) and he cannot now disavow that testimony to evade the statute that governs family expenses. More importantly, however, the court has rejected his testimony that he "probably" drew some such distinction in conversation with Hayes, and has found instead that he promised to repay the

Amex charges full stop. Therefore, the joint and several liability provision of the Act is not essential to his liability. There is no need to take up his additional arguments as to how the Amex charges manage to evade the reach of the Act.

*Second*, the Illinois Frauds Act provides, as relevant here:

> That no action shall be brought . . . whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith . . . .

740 ILCS 80/1. This provision of the Frauds Act applies only if Robert's promise to reimburse Hayes was a promise to repay a debt owed to her by someone else, namely, Susan. That is, this provision applies only if the court credits his assertion that any reimbursement agreement he may have had with Hayes was subject to the understanding that he was to repay "his" business and personal expenses and a "reasonable" share of family expenses, but not "Susan's" expenses or "Susan's" share of the family expenses. Again, the court has already rejected, as a factual matter, the existence of any such distinction as a term of the agreement between Robert and Hayes. That in turn means that Robert was not answering for the debt of another when he promised to reimburse Hayes for the Cavotos' outstanding Amex charges. Therefore, this provision of the Frauds Act does not apply.

*Third*, Cavoto argues that Hayes's counterclaim is "inconsistent with the fact that" she has already discharged the debt by taking a bad-debt deduction on her income tax. He therefore concludes that her counterclaim is barred, although he admits that there is "no binding, on-point legal authority" for this proposition. He purports to reason to this conclusion from the holding in *Westinghouse Elec. Corp. v. McLean*, 938 F. Supp. 487 (N.D. Il. 1996) (Coar, J.), in which this court explained that under the Illinois Credit Agreement Act, "courts have uniformly barred the claims and defenses of debtors which have relied on the existence of oral credit agreements." *Id.*

at 490. Neither the facts nor the relevant statute in *Westinghouse* have any discernable relation to the facts of the present case, and the court is not aware of any rule of law that bars a creditor's recovery of a debt after taking a bad-debt deduction. Recovery of the debt at that point may well have tax implications for the creditor, but that is between the creditor and the IRS. Cavoto has identified no basis in law for barring Hayes's counterclaim.

*Fourth*, in his answer to Hayes's counterclaim, Cavoto asserts that the claim is barred by the statute of limitations. *See* 735 ILCS 5/13-205. Not so. An Illinois defendant may plead a time-barred counterclaim if the plaintiff's own cause of action accrued before the statute of limitations barred the counterclaim. *Id.* § 5/13-207 ("A defendant may plead a set-off or counterclaim barred by the statute of limitation . . . to any action, the cause of which was owned by the plaintiff . . . before such set-off or counterclaim was so barred . . . ."). Cavoto's cause of action under 26 U.S.C. § 7434 accrued when Hayes filed the allegedly fraudulent information return on December 8, 2006. Therefore, assuming *arguendo* that a five-year limitation period applies (as opposed to a ten-year period, as suggested by Hayes), Hayes's counterclaim is well within the saving provision of § 5/13-207.

Hayes also seeks prejudgment interest on the balance of the unpaid debt. The Illinois Interest Act authorizes an award of prejudgment interest "on money withheld by an unreasonable and vexatious delay of payment," 815 ILCS 205/2, provided that "the amount due is a fixed amount or is easily computed." *Bank of Chicago v. Park Nat'l Bank*, 266 Ill. App. 3d 890, 900 (Ill. App. Ct. 1994). Trial courts have "considerable discretion for determination of whether an unreasonable delay warrants an award of prejudgment interest." *Milligan v. Gorman*, 810 N.E.2d 537, 540-41 (Ill. App. Ct. 2004).

While it is well settled that an honest dispute about the existence of a debt (e.g., a good-

faith defense of a breach of contract suit) precludes an award of prejudgment interest, *see, e.g.*, *Boyd v. United Farm Mut. Reins. Co.*, 596 N.E.2d 1344, 1350 (Ill. App. Ct. 1992), the court did not believe Cavoto's testimony that he never expressly agreed to reimburse Hayes or, alternatively, that he agreed to reimburse her only for a subset of the Amex charges. For that reason, the court does not believe that his failure to repay Hayes (or for that matter, his allegations of tax fraud) stems from a good-faith dispute over the existence of a debt. Accordingly, the court awards Hayes prejudgment interest at the statutory rate of 5% per annum. *See* 815 ILCS 205/2. Interest shall accrue from the date of Hayes's demand, i.e., from December 6, 2006.

## CONCLUSION

For the foregoing reasons, the court finds for defendant and counter-plaintiff Mary Lou Hayes on all claims and counterclaims. The court will enter judgment in favor of Hayes in the amount of $30,238.51, plus statutory interest, at the rate of 5% per annum, to accrue from December 6, 2006.

Enter:

/s/ David H. Coar

---

David H. Coar

United States District Judge

**Dated: July 1, 2010**